Ruffin, C. J.
 

 Under the instructions it is to be assumed, that the prisoner did not know the negro belonged to Cobb,
 
 *145
 
 though we think it might well, have been left to the jury, that he did. The residence of those persons within nine miles of each other in the same County, that of the prisoner being at a very public place, and the extreme probability that the prisoner, if before ignorant, would en-quire and learn from the negro, who his owner was, and where he lived, in order to shape his course so as to avoid him, would seem to afford a fair presumption, that the prisoner had information in whom the property was. ' It is, however, now to be taken otherwise ; and then the question is, whether a slave, under those circumstances, can be the subject of larceny. . The Attorney General argued, indeed, that, if that be not so, yet under the statute the offence of taking by violence or seduction and conveying away, with the intents mentioned, is constituted without any reference to the condition of the slave, as being in the owner’s actual possession or a runaway at the time. But the Act applies the words “steal’» and “by violence or seduction take and carry away” to the same subject, namely, “a slave, the property of another and therefore if a runaway slave be not the property of another, so as to be the subject of stealing, we suppose he cannot be deemed his property, so as to be the subject of a taking
 
 by
 
 violence or seduction. This point has not been distinctly presented before, so as to be directly decided. But it is by no means new, and has been involved to some extent in other cases, so as to elicit opinions on it. It seems to us, when it was held in
 
 Hall’s
 
 case, 2 Hay. 105, that a moral and intelligent being was the subject of larceny, because he was a slave, and in the cases of
 
 Davis, 2
 
 Law Rep. 281, and of
 
 Jernigan,
 
 N. G. T. R. 44, that when the owner was known, a runaway slave was also the subject of larceny, that it was virtually decided, that every taking and conveying away a slave
 
 causa lucri,
 
 and
 
 clam
 
 and
 
 secrete,
 
 constitutes a larceny. Chief Justice Taylor strongly puts it in his report of the
 
 *146
 
 argument of the Attorney Ceneral in
 
 Jernigan’s
 
 case, that the reason given by Hawkins, why it is not larceny to take lost goods, namely, because the party if. not much aggrieved, when nothing is taken but what he had lost before, does not apply to a runaway negro ; because the owner is much aggrieved when, after his slave has runaway, his chance of regaining him is lessened, and perhaps destroyed by his asportation. He adds the forcible general remark, that whenever the principles of the criminal law are applied to a species of property unknown to the people, who instituted that law, it is absolutely necessary to consider the reason and spirit of the law, and so interpret it that slaves may be effectually protected ; and that it was evident, that an adherence to the letter of the law, without regard to its spirit, would leave slave property unprotected, as the common law knew no such properly. Upon reasoning of that kind, the Courts came to the resolutions in the cases cited; and the same reasoning reaches the present question- For, when it is en-quired, whether a runaway slave can be stolen, if the owner be not known, it is implied that the taker knew the negro to be the slave of some one and that the taking was
 
 causa lucri.
 
 Admitting those points, the necessity for securing the rights of ownership in negroes imperatively requires, that such a taking of a runaway should be held to be larceny, and the impossibility of holding that a human being has any just similitude to an inanimate chattel that is lost, or to a brute that has strayed from its pasture, prevents an exception founded merely on the want of knowledge in the taker, who, in particular, was the owner of the slave. This subject was incidentally under consideration in
 
 Roper’s
 
 case, 3 Dev. 473, and Chief Justice Hendersojí expressed himself pointedly in terms, w'hich cover the whole ground. He said, that runaway slaves do not fall within the description of lost property ; for, from their nature, being intelligent beings,
 
 *147
 
 they are incapable of becoming estrays, in the legal meaning of the word, and in their runaway state they more closely resemble that class of lost property, than any other. The same idea pervades the statutes regulating the arrest and disposition of runaway negroes and the punishments for harboring them. For it is not only indictable to entice or persuade a slave to absent himself from the service of the owner — in which case a knowledge of the owner is implied — but also to harbor or maintain, under any pretence whatever,
 
 “any
 
 runaway slave,” thus clearly placing the latter crime upon the state of slavery merely of the negro, without regard to the party's knowledge of the ownership. In an indictment or declaration for harboring a runaway, a
 
 scienter
 
 of the ownership is never laid, but only that the negro was a runaway slave, the property of some other person. For it is alike unlawful to harbor such a slave, whether the owner be known or not. Indeed, it is incorrect to say, that, for any rights or powers over the slave by one who takes him, a runaway is without a known owner. For the statutes require that the runaway shall, when taken up, be committed to jail, and if an owner do not appear in a prescribed time the slave is to be sold for public uses; so that the public, if no one else, may be regarded as the owner. At all events, the taker up can, under no possible circumstances, rightfully keep the possession of a runaway slave longer than is requisite to convey him to prison, or gain a property of the most special kind in him, but is at most entitled only to a reward for taking up. This is a remarkable feature in the condition of a runaway slave, which distinguishes it from that of lost goods or stray beasts; for in these last the finder gets the property until the owner appears, and therefore th.e idea of larceny by using the property in any manner is repelled. But that wholly fails in the case of a runaway slave, as the person, who, takes him, must know that he has no in
 
 *148
 
 terest in the slave, and that, as against him, the public at all events has the right, and that it is his duty to provide for the proper disposition of the slave, and not convert him to his own use. Therefore, in such a case, the appropriation of the slave in the manner and under the circumstances, which usually indicate a felonious intention, is as criminal as if the slave had not been runaway. Hence we believe the understanding is almost universal, in every class of the community, that slaves cannot be reckoned among lost things, and that a runaway is, therefore, as much a subject of larceny, as any other slave ; and the Court so holds.
 

 It was further argued, that supposing the slave the subject of larceny or of a taking under the statute, there were other objections to the conviction. It was said first that the Court ought not only to have refused the instruction asked for the State, but ought to have given an instruction, that a possession twenty days after the negro ran away was no evidence of a taking by the prisoner. The argument is fully answered by the fact, that no such instruction was requested, and the Court was not obliged
 
 ex debito justitiae
 
 to give it. But, in truth, it ought not to have been given. For the possession of a stolen thing is evidence, to some extent, against the possessor of a taking by him. Ordinarily, indeed, it is stronger or weaker in proportion to the period intervening between the stealing and the finding in the possession of the accused ; and after the lapse of a considerable time before a possession is shown in the accused, the law infers not his guilt, but leaves that question to the jury under a consideration of all the circumstances. But in the case of a runaway slave, the possession can be called neither recent nor remote ; because, although the negro may-have been long runaway, it does not appear when he was taken by the prisoner, or any one else ; and therefore the jury must judge from the attendant circumstan
 
 *149
 
 ces, coupled with a possession of the prisoner, and- the fact, that a possession is shewn in no one else, when the. slave was taken and by whom. In this case the negro was never seen from the time he ran away, until the night he was put into a car by the prisoner for transportation to a distant place, to which he was carried with all speed by the prisoner, who there under a false name sold him. Considering the subject to be an intelligent being, from whom such information might be obtained as would lead to the obtaining of competent evidence of a prisoner’s taking by some one else, ifjthe fact were so, and that no such evidence is produced, nor likelihood of the fact shewn, and considering the manner in which the prisoner proceeded on his journey and in the sale, this is not only not a case in which there was no evidence of a taking by the prisoner, but it is one in which there is no evidence of a taking by any other person and a high probability of a taking by the prisoner. In all cases of presumption from possession and time much often de« pends on other and minute circumstances. We think therefore, that the position taken at the bar cannot be* maintained, that there could not be a conviction without distinct evidence of the taking by the prisoner himself, inasmuch as the taking might have been by some one, who delivered the negro^to the prisoner. If that were true, it would be impossible to convict any person of stealing a runaway, but upon the evidence of an accomplice; for, being moral agents, they may be seduced and got into possession with such privacy, as to render it impracticable otherwise to establish directly the exact time or the precise means of effecting it. The Court went far enough in “allowing the jury to guess,” without any evidence to the point, that the negro might have been delivered to the prisoner, and so was not taken by him ; and we think the complaint on the part of the prisoner is entirely unfounded, that the Court submitted to
 
 *150
 
 the jury the consideration, whether the prisoner might not have prevailed on the negro to come to him by messages through an agent. For, although it be true, that there was no proof to that point, and therefore it was not strictly proper to leave it to the jury, yet the prisoner has no right to complain of it, since he was the cause of it-For there was as little proof or probability, that the prisoner, as he contended, had received the negro from another person ; and therefore, when the Court, at the instance of the prisoner, left the enquiry upon this last point to the jury, it was not improper to enable them to distinguish detween the. case of a delivery of the negro to the prisoner by one who had taken and acquired full dominion over him, and that, in which the prisoner was the first taker, though enabled to become so by means of messages through a person — another, slave, for example —who merely delivered him, without aiming at or acquiring any dominion over the slave for himself. The position laid down to the jury was correct in point of liw, according to
 
 Hardin’s
 
 case, 2 Dev. & Bat. 407, and the prisoner had sustained no injury from it, though there was no evidence to which it was applicable ; for it was at his own instance that any thing was said on the subject.
 

 It was also insisted, that there was error in telling the jury that it was not necessary for them to decide in which particular way the taking by the prisoner was effected, inasmuch as some of the counts are defective. For, it is argued, the case is not within the rule, that there may be judgment on an indictment containing defective counts, if there be a good one; because that proceeds on the ground, that there was evidence to authorise a conviction upon each and all of the counts, whereas here the jury were told, it is said, that they might convict upon all, if they thought the prisoner guilty upon any one. If that be true, there ought to be a
 
 venire de novo,
 
 certainly ; for
 
 *151
 
 unquestionably the eight counts are bad, in which a taking without a conveying, and a conveying without a taking, are respectively charged. But it is clear, that the supposed error was not committed ; for the Court explicitly put those counts out of the case, in the very beginning of the charge, by telling the jury, that the acts of taking and conveying must concur to authorise a conviction. The meaning evidently was, and the jury could not have mistaken it, that if they found a taking of the negro by violence or by seduction, and also a conveying away, by the prisoner, with the requisite intents, then it was not material, that they should find in which of the modes the taking was effected, but the verdict might be general. The instruction therefore plainly applied only to the counts which charged the stealing, or the taking by seduction and conveying away, or the taking by violence and conveying away ; all of which are good. It assumed, that the jury should be satisfied, that the prisoner was guilty in oue of the modes well charged ; and, if so, it was manifestly of no consequence, whether the conviction was on any one or all of those counts, since the of-fences were of the same grade and the punishment the same. The instruction might relieve the jury of some trouble in their investigation, but could work no prejudice to the prisoner.
 

 Some objections were taken to the insufficiency of the evidence of the identity of the slave of Cobb with the negro carried on the road, and also the apparent discrepancy in the statements as to the times of leaving Golds-borough and Wilmington. But they were points arising upon the evidence and were proper for the jury and not for this Court.
 

 ■ A motion has also been made here in arrest of judg.ment, on several grounds. One of them is, that the indictment does not apply the term “feloniously” fo the vie; lence and seduction, as well as to the taking. But it
 
 *152
 
 clearly does, for the expression, that one “by violence feloniously took.” is the same as that he “feloniously by violence took,” it being impossible, that the thing can be taken feloniously by violence, unless the violence — the means of taking — be felonious.
 

 Another is, that it is not directly averred, that the negro was not the property of Cobb, as by the words, “then and there being the property, or of the proper goods and chattels of,” &c. but only adds the averment after laying the value, “and the property of,” &c. But both forms of expression have the same meaning, and they are used indifferently, This indictment follows in this respect that in
 
 Sparrow’s
 
 case, N. C. T. R. 93 ; and that was held good on a motion in arrest.
 

 A third ground is, that the indictment is uncertain and repugnant in charging an intent to “sell
 
 and
 
 dispose of” the slave, as a disposition may be by other means than that of a sale. But in that respect the indictment is sustained by the precedent in
 
 Harvey’s
 
 case, 2 Dev. & Bat. 390, and the opinion there given on the very point.
 

 Upon the whole, then, the Court sees no error in
 
 the
 
 record. Indeed, we have had no difficulty whatever, but on the question, whether a runaway slave be the subject of larceny, or within the Act of 1779. If the former, he certainly is the latter. But we own, that, were it
 
 res in-tegra,
 
 we should hesitate to hold, that the common law could recognise such a thing as the larceny of a man, and perhaps feel bound to leave it to the Legislature to make a fit provision for the case. But for upwards of half a century it has been held by the highest tribunals to be law here, and has been tolerated and affirmed by the legislature as a salutary security of a very important portion of the property of the citizen ; and therefore the Court now feels bound to follow up the principle thus established.
 

 Per Curiam. Certificate ordered to the Court below.